IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
November 2, 2021 Session

**COREY DENDY v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
**No. 17-04528      Chris Craft, Judge**
_____

**No. W2020-01364-CCA-R3-PC**
_____

The Petitioner, Corey Dendy, filed a petition for post-conviction relief from his conviction of aggravated robbery, alleging that trial counsel was ineffective for failing to contact a witness prior to the Petitioner's guilty plea and that the Petitioner's guilty plea was not knowingly and voluntarily entered. The post-conviction court denied relief, and the Petitioner appeals. Upon review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and TIMOTHY L. EASTER, J., joined.

Ben Israel (on appeal) and Jim Hale (at hearing), Memphis, Tennessee, for the Appellant, Corey Dendy.

Herbert H. Slatery III, Attorney General and Reporter; Jonathan H. Wardle, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Melanie Cox, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

**I. Factual Background**

The Petitioner was charged in a four-count indictment with attempted first degree murder, employing a firearm during a felony, especially aggravated robbery, and aggravated robbery. On December 10, 2018, the Petitioner pled guilty to aggravated robbery, a class B felony, and, pursuant to the plea agreement, was sentenced to ten years, eighty-five percent of which he was to serve in confinement before becoming eligible for release. The remaining charges were dismissed.

The State recited the following factual basis for the plea:

> Had this matter gone to trial, [the] State's proof would be that on October 22, 2016, officers responded to a shooting call at 5273 Flowering Peach. Once on the scene, Officer Edwards met with victim Jeremiah Lockett who stated he'd been shot multiple times by a man he knew as C.
>
> Lockett further stated he heard a knock at the door, answered the door, and allowed C into the house. Lockett stated that once inside, C pulled out a handgun and demanded money from him and Gregory Bowdery. Lockett further stated after C – that after giving C approximately $800 cash, and Bowdery giving C approximately $200, C then shot Lockett twice, once in his upper right thigh and once in the lower right side of his back.
>
> Through research, investigators developed Corey Dendy [the Petitioner] as the suspect C. On April 17, 2017, detectives met with Lockett and he was shown a photographic lineup where he positively identified [the Petitioner] as the person who shot him and robbed him, as well as the person who robbed Gregory Bowdery.
>
> These events occurred here in Shelby County.

The defense stipulated that a factual basis existed for the guilty plea.

At the guilty plea hearing, the Petitioner testified that he was twenty-five years old, that he knew how to read, that he had attended school through the eleventh grade, and that he did not have a GED.[1] The Petitioner said that he had tried to enroll in a GED class while incarcerated, "but they had some type of problem with the class." The trial court advised the Petitioner to use his incarceration to obtain a GED and possibly take college courses so that he would not have to resort to criminal activity or rely on others to support him after his release.

The Petitioner acknowledged that he signed the guilty plea acceptance form. The Petitioner agreed that he knew the rights he was waiving by entering his guilty plea,

---

[1] "'GED'" is an abbreviation for "a general educational development credential awarded by a state-approved institution or organization." Tenn. Code Ann. § 49-4-902(20).

- 2 -

including the right to cross-examine the witnesses against him and the right to have witnesses subpoenaed to testify for him. The Petitioner agreed that he understood the guilty plea, that he was entering the guilty plea freely and voluntarily, and that no one had threatened him, pressured him, or promised him anything to make him plead guilty.

Thereafter, the Petitioner filed a petition for post-conviction relief, alleging that his trial counsel was ineffective and that his guilty plea was not knowingly or voluntarily entered. At the post-conviction hearing, the Petitioner acknowledged that on December 10, 2018, he pled guilty to aggravated robbery in exchange for the dismissal of the remaining charges against him. He also acknowledged that trial counsel had advised him that if he were convicted of the charges at trial, he could receive a total effective sentence that was considerably more than the ten-year sentence provided in the guilty plea agreement.

The Petitioner conceded that trial counsel provided him with the discovery, which included the statements the victims gave to the police. During trial preparation, the Petitioner asked trial counsel to contact Mr. Bowdery. The Petitioner acknowledged that he knew at the time of his guilty plea that counsel had not contacted Mr. Bowdery. Trial counsel advised the Petitioner he would lose at trial, and the Petitioner felt "under duress" to plead guilty. The Petitioner said trial counsel informed him that the only plea offers available were a ten-year sentence at eighty-five percent or a twenty-year sentence at eighty-five percent. The Petitioner had the impression that he had to accept one of the offers that day or go to trial.

The Petitioner said that he "really didn't want to sign for" the guilty plea. Instead, he wanted trial counsel to speak with the victims. The Petitioner also asked to call his mother or his brother to discuss the plea offer. He explained that his brother had paid trial counsel to represent the Petitioner. Trial counsel cautioned the Petitioner not to allow his family to "dictate [his] future" by influencing him to proceed to a trial which he would lose.

The Petitioner wanted trial counsel to speak with Mr. Bowdery because the Petitioner thought Mr. Bowdery was his "only hope," but trial counsel told the Petitioner that he could not find Mr. Bowdery. The Petitioner acknowledged trial counsel had advised that the Petitioner was facing a sentence of twenty-five years for the especially aggravated robbery charge, twenty-five years for the attempted first degree murder charge, fourteen years for the aggravated robbery charge, and six years for the weapons charge. The Petitioner said that the possibility of facing a potential life sentence scared him. The Petitioner acknowledged that because neither trial counsel nor an investigator spoke with Mr. Bowdery, the Petitioner was not aware of what Mr. Bowdery's testimony would have been; therefore, the Petitioner did not freely and voluntarily plead guilty.

On cross-examination, the Petitioner acknowledged that Mr. Lockett had testified at the preliminary hearing about the events on the night of the offense, and the case was transferred to criminal court. However, the Petitioner maintained that during the preliminary hearing, Mr. Lockett "told multiple stories." Additionally, the Petitioner said Mr. Lockett knew the Petitioner's name was "Corey" but only told the police "he was shot by a man name[d] C."

The Petitioner asserted that he understood the consequences of his post-conviction proceeding. The Petitioner specifically acknowledged he was aware that if his post-conviction petition were granted, his guilty plea would be set aside, and his case would be set for trial on all four charges with the possibility of a life sentence.

The Petitioner acknowledged that trial counsel advised him that the plea offer was "a pretty good deal" and in his best interest. However, the Petitioner maintained that trial counsel "forced [him] to enter this plea." The Petitioner conceded that he lied to the trial court at the guilty plea hearing when he asserted that he had not been threatened, pressured, or promised anything to convince him to plead guilty.

The Petitioner said that before he signed the plea agreement, he asked trial counsel if he could "sign for an Alford plea" and that trial counsel said no.[2] Trial counsel also responded negatively when the Petitioner asked if he could do anything to "get back in court" if he signed the plea agreement. The Petitioner said that he thought an "Alford plea is when you plea – when you sign – when you plead to a deal that you think that's in your best interest at that time."

The Petitioner said that he knew trial counsel hired an investigator who had investigated the case, including trying to locate and talk with witnesses. The investigator told the Petitioner that he would try to contact the victims. However, the Petitioner had no further contact with the investigator. Trial counsel told the Petitioner that he was unable to find the victims. The Petitioner stated that he knew the victims before the offense.

The Petitioner said that trial counsel sent another man to talk with the Petitioner prior to his guilty plea. The man asked if the Petitioner was willing to accept an offer of six years with release eligibility after serving thirty percent of the sentence in confinement or a sentence of ten years with release eligibility after serving thirty percent of the sentence in confinement. The Petitioner said that when he went to court in December, he expected trial counsel to ask if the Petitioner was willing to accept "this six at 30." Instead, trial

---

[2] An accused who wishes to plead guilty yet assert his innocence may enter what is known as a "best interest" or Alford guilty plea. See North Carolina v. Alford, 400 U.S. 25, 37-38 (1970).

counsel relayed the offer of ten years with release eligibility after service of eighty-five percent.

The Petitioner acknowledged that trial counsel advised him the original plea offer had been twenty years with release eligibility after serving eighty-five percent of the sentence in confinement. The Petitioner agreed that ten years with eighty-five percent release eligibility was better than life in prison. The Petitioner further agreed that he told the trial court that he wanted to plead guilty and that he was doing so freely and voluntarily with no threats, pressures, or promises.

Gregory Bowdery testified that he knew Jermaine Lockett by the name "McMane" and that he saw Mr. Lockett regularly. Mr. Bowdery stated that he also knew the Petitioner.

Mr. Bowdery said that on October 22, 2016, he and Mr. Lockett were "shooting dice" with someone named "Lil Bobby" or "Little Bobby" at Mr. Lockett's residence. After they had been playing for a while, Mr. Bowdery and Mr. Lockett were robbed. Regarding what "precipitated" the robbery, Mr. Bowdery surmised that Lil Bobby was angry because he was losing money. He said that Lil Bobby made a telephone call and acted as if he were speaking to his girlfriend. Mr. Bowdery thought Lil Bobby "was trying to throw us off or whatever."

Shortly after the call, Mr. Bowdery heard a knock on the door. Mr. Lockett opened the door, ran upstairs, and then came back downstairs. Mr. Bowdery said three men and one woman were at the door, and they came inside the residence. One man was short and bald, the second man had "dreads," the third man "had like a fade," and the woman had red hair. The short, bald man had a chrome pistol, and he shot Mr. Lockett in the left hip in the kitchen. Mr. Bowdery stated that the intruders took $200 from him.

Mr. Bowdery said that after the robbery, he gave a statement to the police which was consistent with his trial testimony. Mr. Bowdery said that he knew the Petitioner before the robbery, that the Petitioner was his "buddy," and that the Petitioner was not one of the men who robbed him. Mr. Bowdery said that the police never showed him a photograph lineup and never asked if the Petitioner was involved in the robbery. Mr. Bowdery said that the Petitioner was not at the apartment that night and that the Petitioner was not involved in the robbery. After he talked with the police, he did not speak with anyone else about the case, including trial counsel or an investigator. Mr. Bowdery said that he remained in Tennessee for a couple of months after the robbery and then moved to Mississippi. Mr. Bowdery said that he had not been offered anything for his testimony at the post-conviction hearing.

On cross-examination, Mr. Bowdery acknowledged that at the time of the post-conviction hearing, he was incarcerated for possession of cocaine with intent to sell. He

also conceded that in 2010, he pled guilty to attempted aggravated burglary and theft of property valued $1,000 or more to $10,000 and that in 2009, he pled guilty to aggravated burglary, possession of marijuana "with intent," and being a convicted felon in possession of a handgun. In 2005, Mr. Bowdery pled guilty to "felony thefts and a burglary," and in 2002, he pled guilty to aggravated assault.

Mr. Bowdery said that he knew the Petitioner "from the neighborhood" and that Mr. Lockett was his friend. Mr. Bowdery testified that he told the police about Lil Bobby, but he acknowledged that his statement did not mention Lil Bobby. Mr. Bowdery said that when he gave his statement to the police, "I just left Lil Bobby name out. It's what happened, though. Lil Bobby did it. Lil Bobby sent the folks to rob us." Mr. Bowdery said the Petitioner was not one of the robbers.

On redirect examination, Mr. Bowdery said that he had not been subpoenaed to testify at the preliminary hearing. Mr. Bowdery asserted that he never told the police the Petitioner robbed him and that he never identified the Petitioner from a photograph lineup. Mr. Bowdery said that he had not spent any time with the Petitioner while they were "out serving time," explaining that he was housed in a different building than the Petitioner and that he was "in a program."

Trial counsel testified that he practiced primarily criminal defense law and had done so for thirteen years. He represented the Petitioner in criminal court but did not represent him in general sessions court. Trial counsel said that he reviewed the discovery with the Petitioner. Trial counsel also told the Petitioner about the charges against him and the sentences he faced. He advised the Petitioner that if he were convicted of all the charges at trial, he faced the possibility of consecutive sentences and could spend the rest of his life in prison. The State's initial offer was twenty years with one hundred percent of the sentence served in confinement, which was significantly lower than the sentence the Petitioner faced if convicted at trial.

Trial counsel stated that he was retained by the Petitioner's family. Thereafter, the Petitioner was declared indigent, and the trial court approved funding for an investigator. Trial counsel hired Investigator North from Inquisitor Incorporated. Trial counsel reviewed the discovery and met with Investigator North and the Petitioner to tell them what he had learned. They discussed the case and decided to pursue a theory of self-defense. Trial counsel recalled that the Petitioner maintained Mr. Lockett had invited him to the residence in order to "make a transaction." After the Petitioner arrived, Mr. Lockett stated that he did not have enough money "to pay for the products that he received." The Petitioner said that Mr. Lockett then "reached for a weapon," which made the Petitioner believe he was being robbed.

- 6 -

Trial counsel said that the defense looked for the Petitioner's girlfriend, Ms. Collins, but they were unable to find her. The defense also tried to speak with Mr. Lockett but were prevented from doing so by Mr. Lockett's attorney. Investigator North discovered that Mr. Lockett had been convicted of robbery, and trial counsel thought that if the Petitioner chose to go to trial, trial counsel could impeach Mr. Lockett with his criminal record and "seedy character."

Trial counsel said that the Petitioner wanted him to solicit plea offers. Trial counsel said that while the investigation was ongoing, the Petitioner told Investigator North that he would plead guilty if trial counsel could secure a plea agreement with a six-year sentence with release eligibility after he served thirty percent of the sentence in confinement. Trial counsel suggested that if the State did not agree to a six-year offer, they might consider a ten-year offer with release eligibility after the Petitioner served thirty percent of the sentence in confinement. The Petitioner agreed that he would be willing to accept a ten-year sentence with thirty percent release eligibility.

Trial counsel tried to contact the witnesses the Petitioner wanted him to contact, but he was unable to do so prior to the Petitioner's guilty plea. Trial counsel stated that settling a case while an investigation was pending was not unusual. Trial counsel further stated that he did not find it unusual that Mr. Lockett and Mr. Bowdery, who each had a criminal history, might not want to talk to trial counsel or the investigator. Trial counsel agreed that presenting the Petitioner's version of "a drug deal gone bad" to a jury would be "a last resort only."

Trial counsel said that on December 10, 2018, the State made an offer of ten years with eighty-five percent release eligibility, and the Petitioner accepted the offer the same day. Trial counsel asked the State for a brief "reset" so the Petitioner could discuss the matter with his family before accepting the offer. The State indicated that resetting the case was not an option and that "it was a one-day offer. He could take it or he could leave it." Trial counsel then met with the Petitioner in the jail lockup so they could discuss the options and "make some game time real life decisions." Trial counsel said that he did not threaten or pressure the Petitioner to make the Petitioner plead guilty and that he explained the "pros and cons" of pleading guilty to the Petitioner. Trial counsel stated, "I would also like to point out that this was a mid-December offer. Sometimes those are the best offers you get in a case and I actually thought it was a gift."

Trial counsel said that he knew Mr. Lockett had suffered "bad" injuries and had testified at the preliminary hearing. Trial counsel believed the State had enough evidence to convict the Petitioner at trial. Trial counsel thought the plea offer was "a good deal" and that the Petitioner should accept it. Trial counsel acknowledged that the Petitioner was in a "stressful situation," but he asserted that "there is a difference between duress and just being stressed out because of the situation you're in." Trial counsel advised the Petitioner

that if he wanted to go to trial, the defense would continue to investigate the case. Nevertheless, the Petitioner chose to plead guilty.

Trial counsel stated the Petitioner acknowledged at the guilty plea hearing that he was pleading guilty freely and voluntarily and that he had not been threatened, pressured, or promised anything in exchange for his guilty plea. Trial counsel said that the Petitioner did not tell the trial court that he was dissatisfied with trial counsel's representation.

On cross-examination, trial counsel said that he and the Petitioner originally planned to pursue a theory of self-defense, which "would have opened up a whole can of worms" because the Petitioner was a convicted felon. Trial counsel used self-defense to negotiate, but he did not try the case on that theory.

Trial counsel thought Mr. Lockett had identified the Petitioner as the perpetrator at the preliminary hearing. Trial counsel knew that Mr. Bowdery was not shown a lineup and did not identify the Petitioner as the perpetrator. However, trial counsel thought that Mr. Bowdery did not "necessarily" help the Petitioner's case. The Petitioner did not tell trial counsel that he knew Mr. Bowdery.

Trial counsel could not recall how much time the defense spent trying to locate Mr. Bowdery, but he knew they had an address for him but were unable to contact him. On December 10, the day the State made the plea offer, the Petitioner did not mention wanting to "follow up" with Mr. Bowdery. Trial counsel did not tell the Petitioner he would lose at trial; however, he advised the Petitioner that the State had enough evidence for a jury to find him guilty.

After the conclusion of the hearing, the post-conviction court issued an order denying the petition. The post-conviction court found that trial counsel was not deficient. The post-conviction court noted that trial counsel had obtained an investigator who had met with the Petitioner and was attempting to locate the Petitioner's girlfriend and Mr. Bowdery. The post-conviction court further noted that trial counsel and his investigator reviewed the discovery with the Petitioner. The post-conviction court found that trial counsel and the investigator were in the process of investigating the Petitioner's case when the State made a "'one day only'" plea offer, which the Petitioner decided to accept. The post-conviction court accredited trial counsel's testimony that he fully advised the Petitioner of the options and that the Petitioner chose to accept the offer rather than to face the possibility of a life sentence. Trial counsel did not force or coerce the Petitioner to accept the guilty plea. The post-conviction court found that the Petitioner freely and voluntarily pled guilty before the defense completed its investigation because "the deal offered by the State was too good for him to pass up." The post-conviction court noted that by pleading guilty, the Petitioner avoided the risk of receiving a much lengthier sentence at trial. The Petitioner filed a timely notice of appeal. On appeal, the Petitioner

contends that the post-conviction court erred by holding that trial counsel was not deficient and that his guilty pleas were knowingly and voluntarily entered.

## II. Analysis

To be successful in a claim for post-conviction relief, the Petitioner must prove the factual allegations contained in the post-conviction petition by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). "'Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" State v. Holder, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999) (quoting Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.3 (Tenn. 1992)). Issues regarding the credibility of witnesses, the weight and value to be accorded their testimony, and the factual questions raised by the evidence adduced at trial are to be resolved by the post-conviction court as the trier of fact. See Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). Therefore, the post-conviction court's findings of fact are entitled to substantial deference on appeal unless the evidence preponderates against those findings. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001).

A claim of ineffective assistance of counsel is a mixed question of law and fact. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999). We will review the post-conviction court's findings of fact de novo with a presumption that those findings are correct. See Fields, 40 S.W.3d at 458. However, we will review the post-conviction court's conclusions of law purely de novo. Id.

When the Petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, "the [P]etitioner bears the burden of proving both that counsel's performance was deficient and that the deficiency prejudiced the defense." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)). To establish deficient performance, the Petitioner must show that counsel's performance was below "the range of competence demanded of attorneys in criminal cases." Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). To establish prejudice, the Petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. Moreover,

> [b]ecause [the P]etitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [Petitioner] makes an insufficient showing of one component.

Goad, 938 S.W.2d at 370 (citing Strickland, 466 U.S. at 697). Further, in the context of a guilty plea, "the petitioner must show 'prejudice' by demonstrating that, but for counsel's errors, he would not have pleaded guilty but would have insisted upon going to trial." Hicks v. State, 983 S.W.2d 240, 246 (Tenn. Crim. App. 1998); see also Hill v. Lockhart, 474 U.S. 52, 59 (1985).

When a defendant enters a plea of guilty, certain constitutional rights are waived, including the privilege against self-incrimination, the right to confront witnesses, and the right to a trial by jury. Boykin v. Alabama, 395 U.S. 238, 243 (1969). Therefore, in order to comply with constitutional requirements a guilty plea must be a "voluntary and intelligent choice among the alternative courses of action open to the defendant." North Carolina v. Alford, 400 U.S. 25, 31 (1970). In order to ensure that a defendant understands the constitutional rights being relinquished, the trial court must advise the defendant of the consequences of a guilty plea, and determine whether the defendant understands those consequences. Boykin, 395 U.S. at 244.

In determining whether the Petitioner's guilty pleas were knowing and voluntary, this court looks to the following factors:

> the relative intelligence of the defendant; the degree of his familiarity with criminal proceedings; whether he was represented by competent counsel and had the opportunity to confer with counsel about the options available to him; the extent of advice from counsel and the court concerning the charges against him; and the reasons for his decision to plead guilty, including a desire to avoid a greater penalty that might result from a jury trial.

Blankenship v. State, 858 S.W.2d 897, 904 (Tenn. 1993). Further, we note that "[a] petitioner's solemn declaration in open court that his plea is knowing and voluntary creates a formidable barrier in any subsequent collateral proceeding because these declarations 'carry a strong presumption of verity.'" Dale Wayne Wilbanks v. State, No. E2014-00229-CCA-R3-PC, 2015 WL 354773, at *10 (Tenn. Crim. App. at Knoxville, Jan. 28, 2015) (quoting Blackledge v. Allison, 431 U.S. 63, 74 (1977)).

Initially, the Petitioner contends that trial counsel was ineffective by failing to make reasonable efforts to contact Mr. Bowdery, despite knowing that Mr. Bowdery was "a critical witness." The Petitioner maintains that Mr. Bowdery was important because he never identified the Petitioner as the perpetrator and because Mr. Bowdery's initial statement to the police differed substantially from Mr. Lockett's statement. The State responds that the Petitioner acknowledged that he knew at the time of his plea that trial

counsel had hired an investigator, that the investigator was looking for Mr. Bowdery, and that the investigator had been unable to locate Mr. Bowdery. Nevertheless, the Petitioner chose to plead guilty. As the State noted, the post-conviction court found that the Petitioner pled guilty freely and voluntarily because "the deal offered by the State was too good for him to pass up." Moreover, the post-conviction court found that the Petitioner's and Mr. Bowdery's testimony at the post-conviction hearing was not credible. We agree with the State. Accordingly, we conclude that trial counsel's performance was not deficient.

The Petitioner contends that if trial counsel had made sufficient efforts to contact Mr. Bowdery, he would not have pled guilty. The Petitioner also contends that his guilty plea was not voluntary because he was under duress due to the "extreme and unnecessary time pressure imposed by the State, and the tremendous cost of refusing the State's offer." The Petitioner complains that the State refused to grant even a short recess to give him time to discuss the plea offer with his family and that he had "a few hours to make one of the most significant decisions of his life," namely whether to accept the offer or go to trial and risk receiving an effective life sentence if he were convicted. The Petitioner contends that the "pressure was intentionally coercive." The State responds that despite having the opportunity to do so, the Petitioner did not tell the trial court that he did not want to plead guilty without speaking with Mr. Bowdery. The State also responds that "the type of 'duress' [the Petitioner] complains of is not the sort of duress that will serve to invalidate a plea." We agree with the State.

At the guilty plea hearing, the Petitioner asserted that he knew he had the right to have witnesses subpoenaed to testify on his behalf at trial, that he understood the plea, that he was pleading guilty freely and voluntarily, and that no one had "threatened or pressured or promised [him] anything to make [him] enter this plea." "'[T]he representations of the defendant, his lawyer, and the prosecutor at [a guilty plea] hearing, as well as any findings made by the judge accepting the plea, constitute a formidable barrier in any subsequent collateral proceedings.'" Marcus Ward Strong v. State, No. E2018-00286-CCA-R3-PC, 2019 WL 2371946, at *16 (Tenn. Crim. App. at Knoxville, June 5, 2019) (quoting Allison, 431 U.S. at 73-74). This is because "'[s]olemn declarations in open court carry a strong presumption of verity[.]'" Id. (quoting Allison, 431 U.S. at 74). Further, the Petitioner had asked trial counsel to engage in plea negotiations and knew a potential plea offer could be forthcoming. The Petitioner's "alleged time pressures, lack of family input, or coercion on the part of counsel [did not] result in his guilty plea being involuntary." Phillip Mark Nunley v. State, No. 01C01-9602-CC-00066, 1997 WL 154074, at *3 (Tenn. Crim. App. at Nashville, Apr. 3, 1997). Moreover, this court has stated that the entry of a guilty plea to avoid the risk of greater punishment does not render the plea involuntary. See Derrick Wade v. State, No. W2019-00432-CCA-R3-PC, 2020 WL 883122, at *5 (Tenn. Crim. App. at Jackson, Feb. 21, 2020); see also Rick Butler v. State, No. M2004-01543-CCA-R3-PC, 2006 WL 2206081, at *6 (Tenn. Crim. App. at Nashville, July 31, 2006) (stating that a guilty plea was not involuntary when the offer was made the morning of trial and the

- 11 -

Petitioner pled guilty to avoid the risk of a lengthier sentence); <u>Stephen E. Miles v. State</u>, No. W2005-01465-CCA-R3-PC, 2006 WL 1381596, at *5 (Tenn. Crim. App. at Jackson, May 16, 2006) (stating that guilty plea was not involuntary when the Petitioner had thirty minutes to accept the plea, he stated that he understood the plea, and he entered the plea to receive a shorter sentence).

### III.  Conclusion

Finding no error, we affirm the judgment of the post-conviction court.

_____

NORMA MCGEE OGLE, JUDGE